**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

UNITED STATES OF AMERICA,                    ) AU:24-CR-00015(1)-DAE
                                             )
    Plaintiff,                               )
                                             )
v.                                           ) AUSTIN, TEXAS
                                             )
GILDARDO ANDRES ZAPATA,                      )
                                             )
    Defendant.                               ) JULY 2, 2025

          **********************************************
          TRANSCRIPT OF ARRAIGNMENT AND DETENTION HEARING
             BEFORE THE HONORABLE SUSAN HIGHTOWER
          **********************************************

APPEARANCES:

FOR THE PLAINTIFF:    JOSEPH PALAZZO
                      CRIMINAL DIVISION
                      1400 NEW YORK AVENUE, NW, 10TH FLOOR
                      WASHINGTON, D.C. 20001

FOR THE DEFENDANT:    DON BAILEY
                      DON BAILEY
                      309 NORTH WILLOW
                      SHERMAN, TEXAS 75090

TRANSCRIBER:          ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by electronic sound recording, transcript

produced by computer.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

**EXAMINATION INDEX**

FERNANDO DAVID
      DIRECT BY MR. BAILEY  . . . . . . . . . . . . . . . . . 15
      CROSS BY MR. PALAZZO  . . . . . . . . . . . . . . . . . 31
      REDIRECT BY MR. BAILEY . . . . . . . . . . . . . . . . . 51

MATEO GOMEZ
      DIRECT BY MR. BAILEY  . . . . . . . . . . . . . . . . . 54
      CROSS BY MR. PALAZZO  . . . . . . . . . . . . . . . . . 59

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

(Proceedings began at 10:05 a.m.)

THE CLERK:  The Court calls Case 1:24-CR-15 *United States of America v. Gildardo Andres Zapata*, for an Arraignment and Detention Hearing.

THE COURT:  Counsel for the plaintiff, please make your -- or the government, that is, please make your announcement.

MR. PALAZZO:  Good morning, Your Honor.  My name is Joseph Palazzo.  I am with the Money Laundering and Asset Recovery Section in Washington D.C.  Nice to meet you.

THE COURT:  Good morning.  And for the defense?

MR. BAILEY:  Don Bailey on behalf of Mr. Zapata, Your Honor.

THE COURT:  Good morning, Mr. Bailey.  So I understand that we're proceeding with the arraignment; is that correct, Mr. Bailey.

MR. BAILEY:  Yes, Your Honor.  It's my understanding that, on initial, you have to have a personal appearance.  So we'll go forward.

THE COURT:  You're able to waive the arraignment, but we can certainly proceed with it, if you'll bring your client and you'll come to the center podium, please.

MR. BAILEY:  Okay.

THE COURT:  So I'll ask the courtroom deputy to please administer the oath to the defendant.

(Defendant sworn)

THE COURT:  Thank you.  So, Mr. Zapata, please state your name and your age, sir.

THE DEFENDANT:  Yes, ma'am.  Gildardo Andres Zapata.

THE COURT:  And can you stand up and talk into the middle microphone.

THE DEFENDANT:  Okay.  Gildardo Andres Zapata, and I'm 47 years old.

THE COURT:  Thank you.  And you obviously speak and understand English, sir?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.  So you're not required to make any statements during this hearing.  This hearing is being recorded, and any statement that you make can be used against.  You have a right to confer with counsel, and your counsel here is present and has already entered his appearance.

So I'll ask you, Mr. Bailey:  Does Mr. Zapata have any physical or mental condition that may impair his ability to participate in or otherwise understand this proceeding, sir?

MR. BAILEY:  No, Your Honor.

THE COURT:  Thank you.  And for Mr. Zapata: Have you taken any medication, drugs, alcohol, or other substances in the last 24 hours that may affect your ability to participate in this arraignment?

THE DEFENDANT:  No, Your Honor.

THE COURT:  So a grand jury has returned an indictment against you, charging you with certain offenses, and you are here for arraignment on that indictment.

Do you have a copy of the indictment, sir?

THE DEFENDANT:  Yes, I do.

THE COURT:  Okay.  And I'll ask:  Do you waive reading of the full indictment, Mr. Bailey?

MR. BAILEY:  We waive reading, Your Honor.  The only thing he won't be entering is a plea to Count Four because there's already been a motion to dismiss that.

THE COURT:  Yes, sir.  I see that.  And I don't have the authority to grant that motion, but I will ask you to please summarize, Mr. Palazzo, the remaining counts against the defendant.

You don't -- again, he's waived reading, so no need to read them.  But could you please summarize the charges and the penalties for those charges, sir.

MR. PALAZZO:  Yes, Your Honor.  Counts one through 3 are violations of Title 26, United States Code,

Section 7206. And the maximum penalty -- it's a felony, and the maximum penalty is a fine of not more than $100,000 or imprisonment not more than three years, or both, together with the cost of prosecution.

THE COURT: Counts Five and Six are violations of Title 26, United States Code, Section 7203, the willful failure to file tax returns, supply information, or pay tax. And the maximum penalty for this felony is a fine of not more than $25,000 and a term of imprisonment not more than five years, or both, together with the cost of prosecution.

THE COURT: Okay. Thank you. So, Mr. Zapata, do you understand that the charges against you and the penalties those charges can carry, sir?

THE DEFENDANT: Yes, Your Honor.

THE COURT: Are you prepared to enter a plea to each of the counts in the indictment, except for Count Four at this time?

THE DEFENDANT: Yes.

THE COURT: And what is your plea to each of the remaining counts in the indictment, sir?

THE DEFENDANT: Not guilty.

THE COURT: Okay. Thank you. A plea of not guilty will be entered on your behalf, and the record should reflect that you are now arraigned. You can

return to the counsel table at this time.

And let me just ask the courtroom deputy: Is Mr. Palazzo picking up on our recording system?

THE CLERK: Yes.

THE COURT: Okay. Thank you. We have had a few issues in terms of -- obviously, we don't have a court reporter; we use the FTR recording system. So I'll just ask you to be mindful of -- we've had some audio issues. Be mindful of speaking into the microphone.

And, as we move on to the Detention Hearing portion of our proceeding, I'll remind counsel that, as required by Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to *Brady v. Maryland* an its progeny. Not doing so in a timely manner may result in sanctions, including exclusion of evidence, adverse jury instructions, dismissal of charges, and contempt proceedings.

MR. PALAZZO: The government understands, Your Honor.

THE COURT: Thank you, sir. So how do you intend to proceed with the detention hearing, sir?

MR. PALAZZO: Just by proffer today, and I would also like the Court to consider the Government's brief that was filed yesterday.

THE COURT: And I'll -- I have read all of

filings that have been made for both sides that are on the docket at this time.  So you may proceed with your proffer evidence, absent any objection from the defense.

MR. BAILEY:  He's allowed to proffer, Your Honor.

THE COURT:  Thank you, sir.

MR. PALAZZO:  Thank you, Your Honor. Government proffers its memo filed at Docket Number 16, as well as the following facts and information to demonstrate by a simple preponderance that no condition, or combination of conditions, can reasonably assure the defendant's appearance at trial.

He is a serious flight risk and should continue to be detained in accord with the recommendation of the pretrial services report that was issued yesterday.

The government is confident that the preponderance standard for risk of flight is easily met here because the record already demonstrates that the defendant has the motive, has the means, and already has a track record of fleeing the United States.

Let's start with motive.  This is a straightforward tax case, Your Honor.  The defendant is charged with three counts of filing false income tax returns and two counts of failure to file income tax returns at all.

In total, the defendant earned over $3 million in reportable income that he failed to report to the IRS and failed to pay taxes on.  And that doesn't even include millions more dollars in unreported income that is uncharged but will be evidence at trial and will be included at sentencing upon conviction.

So one motive for flight, Your Honor, is abundantly clear:  The defendant is aware that he is looking at the sentencing maximum of five years imprisonment.

Also related to the defendant's motivation to immediately flee upon release is the strength of the government's case.  As the defendant already admitted in his papers for today, he began getting paid by the DEA in 1998 at the age of 21 or 22.  And at trial the government will introduce hundreds of exhibits from DEA records documenting cash and check payments to the defendant.

The government will introduce bank statements, accounting records from the defendant's tax preparer, and testimony from multiple witnesses about the defendant receiving millions of dollars that went unreported to the IRS.  The government will also introduce financial records and witness testimony explaining the careful steps the defendant took to hide his unreported wealth, such as maintaining bank accounts and real estate

holdings in the name of other people.

And, not insignificantly, the government will also introduce testimony from multiple witnesses, as well as hundreds of documents, showing that the defendant was specifically warned over and over again, verbally and in writing, to report and pay taxes on the money he was earning from DEA.

In fact, each time the defendant was paid some money, whether it be $50 or $50,000, the defendant was issued a receipt for the money and a written warning to report the applicable income and pay the appropriate taxes.  Now, these receipts with written tax obligation warning were signed and initialed by the defendant after reading.  And DEA kept these receipts in the ordinary course, and they will all be introduced at trial.

The government attached an example to its brief for today.  It is Exhibit B to Docket Number 16.  And the government is proffering that we he have dozens and dozens and dozens of these green receipts, all with the same tax acknowledgment and the defendant's signature.

I would also urge the Court to consider Exhibit A to Docket Number 16, which is a portion of an annual employment contract that the defendant signed for about 20 years, and that the government will be introducing at trial, demonstrating even more clearly

that the defendant's failure to report millions and failure to pay taxes on those millions was his choice, despite many, many warnings.

So, as the Court has heard, the government's evidence is abundant, convincing, and its case is strong, thus reinforcing the defendant's motivation not to appear for trial if released.

Beginning with the evidence that the Court just heard regarding millions of dollars earned, it is also clear that the defendant has the means to flee the Western District, and indeed the United States, to avoid trial.  The government is in possession of direct evidence, including eyewitness testimony and electronic media, that the defendant is an associate of a certain known organized crime figure in Colombia.

As already part of the record, the defendant was living in Colombia for over five years prior to his arrest, was born and raised there, and is a Columbian passport holder who has traveled the world.  The defendant is a multimillionaire with deep familial ties and criminal underworld connections in a foreign country. These alone are the means to escape justice if the defendant is released.  And make no mistake, Your Honor. The defendant will flee this district, and will likely flee this country, if released.

Aside from motive and means or flight, the defendant has already done it once before. He admits in his papers of living and working, quote, flawlessly in the U.S. for 20 years, from about 1998 to 2018. And during that time he got married, he bought a home, and he become a U.S. citizen.

Well, what happened in 2018 that caused the defendant to suddenly give all that up and move to Colombia? What happened is that a good friend and criminal associate was arrested and pled guilty to federal financial crimes and was sentenced to federal prison. And the defendant, who knew he had millions of dollars in unpaid taxes, thought he was next when he was sought for questioning by federal investigators, despite having an employment contract with law enforcement that included an obligation to make himself available.

Instead, what did the defendant do? He picked up and left and made himself scarce. And that is what he'll do again if he is released pretrial. He has the means, he has the motivation, and he has the track record, Your Honor.

So, in closing, I urge the Court to consider three factors found in Title 18, Section --

THE COURT: And are you proceeding on to argument, sir, or are you concluding your proffer of

evidence?

MR. PALAZZO:  Yes, Your Honor.

THE COURT:  Which -- yes to which part?

MR. PALAZZO:  I am concluding the proffer.

THE COURT:  Okay.  Thank you.

MR. PALAZZO:  Yes.

THE COURT:  You can proceed.  Normally -- in this Division, normally after we proceed with our witnesses or proffer, we then go on to argument separately.

MR. PALAZZO:  Okay.  So shall I let counsel --

THE COURT:  Did you have any more conclusion for your evidence portion?

MR. PALAZZO:  No, Your Honor.

THE COURT:  Okay.  Thank you.

So, Mr. Bailey, how does the defense plan to proceed today?

MR. BAILEY:  Your Honor, so there is no witnesses for the government?

THE COURT:  There are no witnesses for the government.  He proceeded --

MR. BAILEY:  Just an opening statement and a proffer.

THE COURT:  -- simply by proffer only, and you didn't object to his proffer, sir.

MR. BAILEY:  It was an opening statement.  I didn't know what it was going to be.  So it wasn't -- I didn't hear him proffer from anybody.

THE COURT:  He did proffer evidence.

MR. BAILEY:  Okay.  I'll call witnesses, Your Honor.

THE COURT:  Okay.

MR. BAILEY:  Your Honor, we'll call Fernando David, which is my first witness.

THE COURT:  You may proceed.

You can come up to the witness stand.  Come around to the right, and the oath will be administered.

(Witness sworn)

THE COURT:  Thank you.  You can be seated.  I can see that your microphone is on.  Make sure that you're speaking directly into it, and begin your testimony by stating and spelling your name, please, sir.

THE WITNESS:  Yes, ma'am.  Fernando David, F-e-r-n-a-n-d-o D-a-v-i-d.

THE COURT:  Thank you.  You may proceed, Mr. Bailey.

MR. BAILEY:  Your Honor, may I approach?  I need to give him this book with exhibits in it.

THE COURT:  You may approach.

**FERNANDO DAVID,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. BAILEY:**

Q.    Mr. David, how are you employed?

A.    Right now I'm retired.

Q.    Retired from where?

A.    Yes.  Law enforcement.  I did 27 years in law enforcement.

Q.    Was that with the DEA?

A.    The majority of it.

Q.    Okay.  And you were also with the Marine Corps; is that correct?

A.    That's correct?

Q.    Okay.  Were you in other law enforcement?

A.    Yes.  A state trooper with Florida and a Fort Lauderdale police detective.

Q.    Okay.  And what did you specifically do with the DEA?

A.    I worked in the money laundering.

Q.    Okay.  Are you familiar with Andres Zapata?

A.    Yes, I am.

Q.    You're here as a volunteer investigator; is that correct?

A.    That's correct.

Q.    You're not getting paid?

A.    I'm not getting paid.

Q.   And you're the one that actually called me when he got picked up?

A.   Yes, sir.

Q.   Okay.  Do you know -- did you ever work with Andres Zapata?

A.   Not directly, no.

Q.   He worked in a different group; is that correct?

A.   He worked for a different group.  Yes, sir.

Q.   Okay.  You heard Mr. Pallazo's argument.  Do you agree with all of that?

A.   No, sir.

Q.   Okay.  I gave you the memorandum in support of the motion for detention they filed yesterday, correct?

A.   Yes, sir.

Q.   Let's go through a few of those things.

      He said the government's evidence will demonstrate the defendant failed to report income, and failed to pay applicable taxes on that income, despite hundreds of warnings to report and pay.

      Are you familiar with informants?

A.   Yes, sir.

Q.   Do you-all warn them not to -- do you know of any warning that Mr. Zapata received about not paying taxes?

A.   Not Mr. Zapata.  No, sir.

Q.   Okay.  Now, they also say that the defendant

received a receipt and signed, written acknowledgment regarding tax obligations that read, "I acknowledge that all payments I receive as indicated in this section, that qualify as taxable income, must be reported."

Is that what's on a 103?

A. No, sir.

Q. Okay. What's -- what is that on? Is that on the DEA file?

A. I'm sorry. I don't ...

Q. Okay. What -- first of all, do they receive a receipt?

A. No, sir.

THE COURT: Okay. Let me just interject, Mr. Bailey, that all we're determining here is detention. So to the extent that your questioning of the witness goes to the weight of the evidence against the defendant, that's fine. But, obviously, we're not here for guilt or innocence today.

MR. BAILEY: I understand, Your Honor. But it's one of the elements of 3142.

THE COURT: Yes, sir. I'm well aware of the elements of 3142. You can proceed.

MR. BAILEY: And I've got to respond to what he said, so I've got to go through it, all the false statements.

THE COURT:  Okay.  I'd ask both counsel, and particularly you at this time, Mr. Bailey, to keep in mind the purpose of the detention hearing today.

MR. BAILEY:  I understand.

THE COURT:  Thank you.

Q.   (BY MR. BAILEY) Okay.  And the reason they don't receive receipts is because they're confidential human sources, it allows plausible deniability, and they -- the DEA doesn't want these receipts out, do they?

A.   That's correct.

Q.   Okay.  And you've seen the -- in Exhibit 5 in that book is Agent Oldano's statement, who is retired?

A.   Yes, sir.

Q.   Was he one of the agents that worked with Mr. Zapata?

A.   Yes, sir.

Q.   And in that he says that when informants are signed up with the DEA, they enter into a contract and they're not issued W-2s or 1099s; is that correct?

A.   That's correct.

Q.   Are they issued any receipt that they can take to the IRS and say, This is what I make?

A.   No, sir.

Q.   Does the government issue 1099s to informants?

A.   No, sir.

Q.   Is there a reason for that?

A.   Yes, sir.

Q.   Okay.  Last week the FBI disclosed that their informants were being killed in Mexico, didn't they?

A.   Yes, sir.

Q.   And that's because they were doing surveillance on the informants?

A.   That's correct.

Q.   It's a very dangerous business?

A.   Yes, sir.

Q.   And Andres was deactivated in January of 2018.  Are you aware of that?

A.   Yes, sir.

Q.   Okay.  And when he was activated -- deactivated, it was because of a former agent named Jose Irazary and an informant called Gustavo; is that correct?

A.   That's correct.

Q.   And -- but his -- but him leaving the country had nothing to do with these two getting arrested, did it?

A.   That's correct.

Q.   Okay.  He left the country because he had just got divorced in 2015; is that correct?

A.   That's correct.

Q.   And these houses that they're talking about, there was -- there was four condos, a house they were living

in, and then a house that Mr. Zapata had given to his sister. Are you aware of that?

A. Yes, sir.

Q. And as part of the divorce in 2015, two of them were signed over to the wife, two of them were sold, and the house they were living in was sold?

A. That's correct.

Q. So what's left is the house that Mr. Zapata gave his sister, and she's still got that house?

A. That's correct.

Q. Okay. And whatever money he took from there, he took to Colombia with him?

A. That as far as I know, yes.

Q. And are you aware of any money being left at this point?

A. No, sir.

Q. Okay. Because he took $262,000, approximately, in a wire transfer to Colombia from bank account to bank account, correct?

A. That's correct. That's what I believe. Yes, sir.

Q. And then he hired a lawyer. Now, these -- the government says there was a lawyer out of Miami. Are you aware of any lawyer out of Miami?

A. No, sir.

Q. Where was the lawyer out of?

A.    I'm aware of a lawyer that's out of Boston.

Q.    Okay.  And that's Ray -- you're going to have to say his last name.

A.    Yeah.  Ray Manzioli (phonetic) or something like that.

Q.    Mr. Zapata paid him $100,000 on this issue that the government wanted to talk to him, correct?

A.    The exact figure I'm not sure what he paid --

Q.    Okay.

A.    -- what he paid him.

Q.    Well.  But, anyway, we've determined that Mr. Zapata doesn't have any money left, he doesn't have any property left, and that's what he reported to Probation?

A.    That's correct.

Q.    Okay.  Now, they -- Mr. Palazzo also says:  At the time of his departure from the United States, the defendant maintained multiple bank accounts and owned six residential properties.

      Is it your understanding that the properties have all been disposed of in 2015, except for the one property belonging to the sister?

A.    That's correct.

Q.    Okay.  So -- and they were held by the nominee -- those properties were in the name of the sister?

A.    That's correct.

Q.    Okay.  But now two of them are in the name of the --
the ex-wife?  The two condos?

A.    That's correct.

Q.    And the other two condos have been sold?

A.    Correct.

Q.    And the fifth -- the house they lived in was sold,
and that was part of the money he took to Colombia?

A.    That's correct.

Q.    Okay.  So he's not a multimillionaire with money
hidden here and there, is he?

A.    As far as I'm aware, I don't know what he has left.

Q.    Okay.  Now, with regards to the -- if you'll go to
Exhibit 3.  Are you familiar with that?

          MR. PALAZZO:  Your Honor, objection:  We're
here to talk about risk of flight.  And I don't know how
this exhibit could possibly have anything to do with risk
of flight.  It was also just handed to me when I walked
in.

          THE COURT:  What's your response to the
objection?

          MR. BAILEY:  Your Honor, I -- first of all,
there is no -- the rules of admissibility are not
applicable to a detention hearing.

          THE COURT:  The rules of evidence don't apply
to a detention hearing.  Correct.

MR. BAILEY:  And the second thing is I offered to give them to him on Friday, but he wasn't here. Because I told him I would give him the discovery on Friday.

THE COURT:  Well, I think this -- as far as I'm seeing, this is a note with just a couple of lines on it, and I also fail to see the relevance to the detention question of most of what we've heard so far.  But I'll overrule the objection at this time and let you proceed with questioning about it.  It hasn't been offered in admission.

Q.    Okay.  Joseph Palazzo is the prosecutor on this case, correct?

A.    Yes, sir.

Q.    He was trying to get Mr. Zapata to come to Houston to pick up $15,000.

A.    That's my understanding from the -- from the receipt.

Q.    Okay.  And that was in 2022?

A.    2022.

MR. PALAZZO:  Your Honor.  Objection:  I don't know what this has to do with risk of flight.

THE COURT:  Well, I just overruled that objection to the questioning about it, but I think that you've reached --

MR. BAILEY:  I'm basically through with this, Your Honor.

THE COURT:  Please don't talk over me again, Mr. Bailey.  I think you have reached pretty much the end of any relevance that you might have from this exhibit. If you have any other questioning about it that is relevant to the question of flight, you can proceed and I'll overrule the objection once again.

MR. BAILEY:  No, Your Honor.  I said I was through with this -- this issue.  I just wanted to bring it out.

Q.   Okay.  So Mr. Zapata left in 2018 after he had been -- what was -- in January he had been disestablished as a confidential informant?

A.   He was deactivated, yes.

Q.   So he was no longer making money for the DEA?

A.   That's correct.

Q.   Do you know why the DEA kept paying him in 2019 and 2020?

A.   From past cases.

Q.   Past cases?

A.   That he worked on, yes.

Q.   Okay.  And was -- were you present when some of that money was delivered to him in Medellin?

A.   I was present for one, yes.

Q.    Okay.  And was that because he had arranged to make a meeting with the government?

A.    Correct.

Q.    But the government had posed a condition that he couldn't bring a lawyer?

A.    That's correct.

Q.    And so he didn't go to the meeting?

A.    That's correct.

Q.    But he was in Colombia?

A.    That's correct.

Q.    And he was willing to meet with them?

A.    That's correct.

Q.    His only condition was he wanted his lawyer there?

A.    That's correct.

Q.    Okay.  So you've seen the Exhibit 4, which is retired agent Brian DeJoy's statement.  And Mr. Zapata -- and there's three statements from ex-agents in here, and they all say that he was not a flight risk, he's a solid citizen, he's served his country well, and that -- that informants are told not to pay taxes?  Some informants are, correct?

A.    I can't speak on what they wrote, but that's what they wrote in the letter.

Q.    That's what John Oldano said in his letter, correct?

A.    That's correct?

Q.    That he approached people in his department and asked about paying taxes, and he was laughed at?

A.    That's correct.

Q.    And told that nobody pays taxes?

MR. PALAZZO:  Objection, Your Honor.  We're here to talk about risk of flight and not try the case or have a mini-trial.

THE COURT:  What's the -- which specific part of the question are you objecting to?

MR. PALAZZO:  There's a lot of questioning about an Agent Oldano instructing whether or not he should pay taxes.  I don't think that's relevant at all to whether or not he's going to flee if released today.

THE COURT:  Mr. Bailey, are you pursuing this line of questioning to be directed to the weight of the evidence?

MR. BAILEY:  Yes, Your Honor.  And also according to *Cheek v. United States*, it's got to be a willful act, and he has a good-faith defense to any income tax case.  And that's the Supreme Court 1990.

THE COURT:  Okay.  I'll allow this line of questioning going to weight of the evidence as one of the factors to consider under the detention decision.  So you can continue, Mr. Bailey.  And the objection is overruled.

Q.    (BY MR. BAILEY) Okay.  And Andres has been a citizen of the United States since 2014; is that correct?

A.    That's correct.

Q.    Has he ever done anything that anybody told him not to do?

A.    As far as I'm aware, no.

Q.    Did he follow instructions as directed all the time?

A.    That's correct.

Q.    Would there be four agents, three with written notes and you testifying, here if he was a scumbag?

A.    No.

Q.    Okay.  Now, with regards to -- let me just finish this part right here.

      Do you -- Mr. Pallazo has said that he's got associates that are known narco.  Are you aware of anything like that?

A.    No.

Q.    He probably knows at lot of narcos, doesn't he?

A.    He definitely knows a lot of them, yes.

Q.    And that's because he was setting them up and punishing them?

A.    When he worked -- when he was an informant for the U.S. Government, he did a very good job.

Q.    Okay.  And Mr. Pallazo says that he's got a track record of fleeing the United States to avoid questioning.

Has he ever fled the United States to avoid questioning?

A.   As far as I'm aware, no.

Q.   Are you aware that he stayed in Colombia from the time he left here, in December of 2018, until they picked him up on June the 17th, 2024?

A.   That's correct.

Q.   He didn't go anywhere, did he?

A.   That's correct.

Q.   And he was in touch with his lawyer?

A.   That's correct.

Q.   Was there any Miami lawyer involved that you know of?

A.   No.

Q.   Because in this -- in Mr. Pallazo's deal, it says he was talking to a lawyer in Miami.

A.   I'm not aware of any attorney in Miami.

Q.   Okay.  Based on your knowledge of Mr. Zapata, is he a risk of flight?

A.   No, sir.

Q.   Does he have money stashed anywhere?

A.   I don't know, sir.

Q.   But we haven't determined there's any money?

A.   No.  Through my investigation, we cannot find any other source of income.

Q.   And there -- in Colombia, if they wanted to look, they could call *[unintelligible]*, which is the Department

of the Treasury, and they could pull his -- under his citizen number, they can pull all his bank accounts up, couldn't they?

A.    That's correct.

Q.    That's correct.  And they have that kind of relationship with Colombia, that they could do that?

A.    Yes, sir.  That's correct.

Q.    They could also -- so you worked in Colombia for the U.S. Government?

A.    That's correct.

Q.    And the -- with regards to the travel, there's also a migration department within Colombia, where they can go get all his records of where he traveled to, correct?

A.    That's correct.

Q.    So, basically, he hasn't traveled anywhere in the last six years, except for when the government picked him up and put him in prison in Colombia?

A.    That's correct.

Q.    What kind of risk was he going under when they threw him in prison in Colombia?

A.    High-risk.  That -- La Picota is one of the most dangerous jails in Colombia.  And had his information been liked, he would have been in great danger in Colombia.

Q.    Okay.  You've seen the -- the IRS agent's statements

in Exhibit 2, Mr. Spencer -- Agent Spencer?

A.    Yes, sir.

Q.    And he just -- he just outs him as a DEA informant, doesn't he?

A.    Yes, he does.

Q.    Okay.  And that information is released to the Colombian government as part of an extradition package?

A.    Yes, sir.

Q.    And so -- and it was in the press.  We saw it in the press starting about five months ago?

A.    Yes, sir.

Q.    But he's here alive today?

A.    Correct.

Q.    Okay.  What is your recommendation to the Court as far as detain or release?

A.    I don't see him as a flight risk.

Q.    Okay.  Has there -- do you think there's conditions that could be imposed such as, if necessary, house arrest, electronic monitoring, that he could maintain --

THE COURT:  Mr. Bailey, I think this is inappropriate questioning about the legal conclusion.  This witness is not qualified to tell me how to weigh the factors, sir.

MR. BAILEY:  I understand, Your Honor.

THE COURT:  So I think you can end that

question.

MR. BAILEY:  Thank you.  I'll pass the witness, Your Honor.

THE COURT:  Thank you.  Any questions for this witness, from palazzo.

MR. PALAZZO:  Yes, Your Honor.

**CROSS-EXAMINATION**

**BY MR. PALAZZO:**

Q.   Mr. David, could you tell us a little bit more --

THE COURT:  Let me just tell you, Mr. Pallazo -- and this is true for both counsel.  You're welcome to use the center -- you've sort of got your back to the witness -- if you prefer.  Or you can both stay at your table.  That's fine.

MR. PALAZZO:  Thank you, Your Honor.  I will take you up on that.

Q.   Mr. David, could you tell us a little bit more about what you do for a living?

A.   Right now I'm retired.  I do some investigative work for attorney Don Bailey.

Q.   And tell us about that investigative work.  Is that criminal?  Is it civil?  What does it entail?

A.   Mostly criminal.  Helping him do some background checks and some interviews.

Q.   Okay.  And what is a typical background check?

A.    We check, for example, if he needs me to check to his family history, criminal history, bank records, interview past family members, et cetera.

Q.    Okay.  And so, as a civilian, what are the tools you have to do criminal background checks?

A.    Well, NexisLexis [sic], which is probably the biggest.  And then just interviews.

Q.    So through LexisNexis there is a service where you as civilian can access criminal records?

A.    We can also access Pacer through the attorney's account.

Q.    Well, let's stick with LexisNexis, though.  Tell us a little bit about LexisNexis and how you get access to criminal records.

A.    It gives us access to all public records.  So, for example, if there was a citation issued in Broward County, for example, we can go through NexisLexis [sic].  We can actually even do it through the regular Internet, which I've done before, and it will give you tickets and anything that's in public record.

Q.    So are arrest records public?

A.    Not -- no.  Not all of them, no.

Q.    Okay.  So when you testified that you have access to criminal background records through LexisNexis, what did you mean by that?

A.    Anything that's public.  So, for example, like I mention before, if it's posted as a -- a DUI arrest, if it's posted as a traffic citation, if it's posted -- anything that's posted publicly, it will be in LexisNexis.

Q.    And you testified that you're a DEA agent?

A.    I testified that I was in law enforcement.  I was a TFO officer with DEA for 15 years.

Q.    And you were a Florida state trooper?

A.    I was.  Yes, sir.

Q.    And as a background investigator, do you ask former colleagues for help doing background checks?

A.    Currently?  I don't understand the question.

Q.    Currently.  Is it part of your investigation to ask former colleagues who are still in law enforcement for assistance in your criminal background checks?

         MR. BAILEY:  Your Honor, I'm going to object. This is far afield from where we're at.

         THE COURT:  I overrule the objection.  These were questions that were asked.  You asked him about his background, so I think it's fair game for cross.

         You can proceed, Mr. Pallazo.

A.    In you're asking me have I contacted prior coworkers, yes.

Q.    And have you done that for Mr. Zapata?

A.   Only the coworkers that were listed on these -- on these letters.

Q.   When did your investigation of Mr. Zapata begin?

A.   Probably -- I can't remember when Don got the case. Probably a year ago.

Q.   Okay.  And did you sign some sort of contract with him?  Is there anything --

A.   No, sir.  I'm doing this -- I'm doing this to help Don out.

Q.   Okay.  And what specifically was the request for you to do in your investigation?

A.   Just to, for example, get the letters, talk to some -- figure out, for example, the houses that were mentioned, just to check routine stuff that he would need help with.

Q.   Okay.  And you testified about Mr. Zapata's finances a little bit just now; is that right?

A.   No.  What do you mean testified as to finances?

Q.   Well, I guess I'm summarizing.  I apologize.

Mr. Bailey asked you some questions about Mr. Zapata's financial background, his assets.  He asked you about property and bank accounts.

A.   Correct.

Q.   Do you recall that just now?

A.   Correct.

Q.    What investigative steps did you take prior to today to find the answers to those questions?

A.    None.  Other than the properties, none.

Q.    Well, he asked you about bank accounts.  So did you investigate --

A.    No.  The question of bank accounts -- the question that he asked me about bank accounts was whether or not the U.S. Government had access to those bank accounts, and my answer was yes.

Q.    Okay.  Did you investigate any bank accounts?

A.    No, sir.

Q.    Did you conduct interviews with anyone about Mr. Zapata's bank accounts?

A.    No, sir.

Q.    How about his financial background, in general?  Did you interview anybody about his financial background?

A.    No, sir.

Q.    I think I heard you testify, though, saying that you weren't aware of him having significant means, some of the millions of dollars that he earned from DEA.  I think you testified you didn't know?

A.    In terms of the -- like, the properties, yes.  I'm not aware of him having any -- any properties outside of the ones mentioned.

Q.    Or money, though.  Attorney Bailey --

A.   Correct.  Or money.

Q.   Well, let me finish.  Attorney Bailey asked you if you knew if he had any money or if he had any money left; is that right?

A.   That's correct.  I'm not aware of that.

Q.   Okay.  Did you take any investigative steps, though, to try to become aware of that?

A.   When you say investigate, outside of checking the records that we originally received through his bank records, yes.  That -- yes.  But if you're asking me if I subpoena banks, no.

Q.   Where did you receive bank records from?

A.   If -- I'm going to repeat what I said.  If you're asking me about the statements that were already covered by Mr. Bailey, meaning -- meaning the payments that were made and the houses that were -- that he had in the past, we did those checks.  Outside of that, there was no other checks done?

Q.   Okay.  Are you a licensed private investigator?

A.   No, sir.

Q.   Does the State of Florida require a license?

A.   No, sir.  If you're working for an attorney, no.

Q.   Okay.  Did anyone give you financial records belonging to Mr. Zapata to --

A.   No, sir.

Q.    -- examine?

Sorry.    Just so we get a record of your answer, did you ever receive financial records before today, belonging to Mr. Zapata, so that you could examine them and do some sort of financial investigation?

A.    No, sir.

Q.    When did you, I guess, retire from DEA service?  Did you go back to your police department?

A.    Yes, sir.

Q.    Okay.  When was that?

A.    2019.  Well, I officially retired 2019.  I went back in 2018.

Q.    So tell me about that.  So you became a Florida state trooper, when?

A.    No, no, no.  I was a state trooper.  Then from the state police -- from Florida Highway Patrol, I went to Fort Lauderdale Police Department.

Q.    Oh, okay.

A.    And at the Fort Lauderdale Police Department, I was detached to DEA.  And then I stayed there until 2018. 2018 I returned and retired.

Q.    Okay.  So let's just back up a second just so we create a good record here.  When did you become a Fort Lauderdale police officer?

A.    2020.

Q.    I'm sorry?

A.    I'm sorry.  In 2000.

Q.    In 2000.  And then when were you sent to DEA?

A.    2004.

Q.    And just so I understand, "TFO" stands for task force officer; is this right?

A.    Yes, sir.

Q.    You essentially get a DEA badge and -- is that right?

A.    That's correct.

Q.    And you used the word "detached," so you are imbedded with DEA?

A.    That's correct.

Q.    And your management structure is DEA?

A.    Yes, sir.

Q.    What group were you in in 2004?

A.    I've been in multiple groups.  My last group was 13.

Q.    Okay.  But starting in 2004, what group were you in?

A.    Group 1.  Then I went to HIDTA.  I was in HIDTA for 10 years.  In HIDTA -- I was in three groups in HIDTA and then finished in Group 13.

Q.    You finished in Group 13, and that was through and including 2018?

A.    '18, correct.  I left in '18.

Q.    And do you remember what month in 2018 you left the

DEA?

A.   No.  I don't remember.

Q.   Well, do you remember what part of the year, like what season it was?  Was it the fall?  Was it the spring?

A.   It was probably -- probably the spring.

Q.   Okay.  And then after you returned to Fort Lauderdale PD, when did you retire?

A.   Officially in 2019.  But I -- I took leave for the majority of the year.

Q.   Why is that?

A.   Because I had time to burn.

Q.   Okay.  Why did you go back to Fort Lauderdale PD?

A.   Because I was retiring.

Q.   Was it your decision to go back to Fort Lauderdale PD?

A.   Well, it was two reasons why I went back.  One of the reasons -- before I went back, they were trying to replace me.  So in order to get a replacement, they wanted me to go back.  I didn't want to go back as early as I did, but I ended up going back early based on the decision to get someone to replace me in the unit.

Q.   Was it your decision to go back to Fort Lauderdale PD, or did DEA send you back?

A.   A little bit of both.  DEA sent me earlier than I wanted to.  But, yes, I was going back.

DAVID - CROSS                          40

Q.   Were you under investigation by DEA OPR when you were sent back to Fort Lauderdale PD?

A.   No, sir.

Q.   Were you ever investigated by DEA OPR?

A.   As far as I know, no.

Q.   You testified you never worked with the defendant; is that right?

A.   That's correct.  Not directly.  We never -- he was never assigned to us.

Q.   Well, just in plain terms, though, you -- what was your job as a TFO?  It was to enforce money laundering and drug laws; is that right?

A.   That's correct.  My main role almost my entire career was doing -- part of an AGEO program, and I was the undercover officer for all money pickups for our groups.

Q.   And what AGEO was that?

A.   I'm sorry?

Q.   What AGEO was that?

A.   There was three.  I think the last one was -- *vuelta sucia* was the last one that I worked under.

Q.   Okay.  And what were the other two?

A.   Green dollar, I believe it was, or green tide.  That was at HIDTA AGEO.  And *coco rico*.

Q.   So that's four: green dollar, green tide, *coco rico*.

DAVID - CROSS                    41

A.    No, no.  Green tide, *vuelta sucia*, and *coco rico*.

Q.    Okay.  Why did you say green dollar?

A.    I don't remember what -- it was green -- I believe it was green tide.

Q.    Was there an AGEO called green dollar?

A.    No.  Not that I'm aware of, no.  It could be.  I don't know.  I'm not aware of all AGEOs.

Q.    But you're not aware of an AGEO called green dollar.

A.    I'm not aware of green dollar, no.

Q.    Now, throughout all this money laundering work, did you ever work a case that Mr. Zapata was involved in?

A.    No, sir.

Q.    Never?

A.    Never.

Q.    Were you aware of who Mr. Zapata was while you were a TFO?

A.    Oh, yes, sir.

Q.    While you were a TFO?

A.    Oh, yes, sir.

Q.    And were you aware that Mr. Zapata was being paid by the DEA?

A.    Yes, sir.

Q.    Do you recall when you first heard about Mr. Zapata?

A.    Early on in my career.  The exact point I don't remember, but it was early on.

Q.   And when you testified earlier about him receiving payments and not receiving a receipt, on what basis were you giving that answer?

A.   We -- on my personal experience, we never give a receipt.

Q.   Okay.

A.   They sign the paperwork, but they don't get a copy of the paperwork.

Q.   So you're not familiar with the green sheets, as they're sometimes referred to at the DEA?

A.   I'm very familiar with them.

Q.   Also known as DEA Form 103?

A.   103.  Yes, sir.

Q.   Is that a receipt?

A.   For us.  But the defendant doesn't get a copy of that.

Q.   Now, when you say he doesn't get a copy of it, does the green sheet also have a duplicate copy?

A.   They have copies, yes, sir.

Q.   That's white --

A.   Yes, sir.

Q.   -- is that right?

And who gets the white sheet and who gets the green sheet?

A.   I don't remember anymore.  One goes to the CI

coordinator. One goes to the CI coordinator, and the other one goes into the file.

Q. Okay. And your testimony here today is that you've never heard of an independent contractor from DEA who gets paid receiving a copy of the 103?

A. Correct. That's my testimony. I've never heard of that.

Q. Okay. Does the DEA 103 have an acknowledgment or a warning about paying taxes?

A. Yes, it does.

Q. And have you ever read this yourself?

A. Yes, sir.

Q. And have you ever issued a DEA Form 103 as part of your job?

A. Yes, sir.

Q. And do you go over the DEA 103 with an independent contractor?

A. Yes, sir.

Q. Is that the policy of DEA?

A. That's the policy. Yes, sir.

Q. So does that include the tax warning?

A. Yes, it does include the tax warning.

Q. And then is the signature on the DEA 103 for the person receiving the money, is the signature box directly underneath that tax warning?

A.    That's a good question.  I believe so, but I don't have the form in front of me.

Q.    Okay.  When you worked with independent contractors, did you do that as part of your service?

A.    That's correct.

Q.    And when they become an independent contractor, do they sign a contract?

A.    Yes, sir.

Q.    And is that contract -- does that also include tax warnings?

A.    Yes, sir.

Q.    And specifically about, if they receive compensation as an independent contractor, it's their responsibility to report and pay the applicable taxes; is that right?

A.    That's correct.

Q.    And that's something that's also signed in the presence of witnesses?

A.    That's correct.

Q.    And did you ever do that as a DEA investigator?

A.    Yes, sir.

Q.    You testified about a payment in Medellin that you were present for?

A.    That's correct.

Q.    Earlier today?

A.    Correct.

Q.   Could you tell us a little bit more about that? When did that take place?

A.   I don't remember the date.  I don't remember when that was done.

Q.   Okay.  You don't remember year?

A.   No.  I don't remember the year.  It was 2016, '17. Then, maybe.  I don't remember the year.

Q.   You were still a TFO at the time; is that right?

A.   That's correct.

Q.   Okay.  Do you remember why you were in Medellin?

A.   I -- I don't remember exactly.  I was working.  I'm trying to remember.  It's been so many incidents.  I don't remember.

Q.   Was the meeting with Mr. Zapata scheduled?

A.   Was the meeting -- yeah.  The meeting was scheduled.

Q.   By whom?

A.   It was out of the Bogota office, I believe, that scheduled it.

Q.   And were you alone when you had this meeting?

A.   No, sir.  I didn't have the meeting.  No, sir.  The Bogota office had a meeting with Mr. Zapata.  And I don't remember -- I'm trying to remember the whole incident. But no.  It was scheduled -- it was scheduled out of the Bogota office.

Q.   Okay.  You were present for the meeting; is that

right?

A.   Correct.  I was wasn't part of the meeting, but I was present in the meeting.  I mean, I wasn't part of the meeting, but I was present when he was getting paid.

Q.   What does that mean?

A.   So, if I remember correctly, they scheduled the meeting.  We -- we were another group.  They met in Medellin, and they paid him in Medellin.

Q.   Okay.  Try not to use pronouns.  Who is "they"?

A.   The DEA --

Q.   Who was with you?

A.   The Bogota office.

Q.   But who are the individuals?

A.   I don't remember their names, sir.

Q.   So you don't remember when this was, who was with you, who scheduled the meeting, why you had the meeting.  But you are certain about certain details that --

A.   No.  The only thing I'm certain about is that he got paid.  That's the only thing I'm certain about, that he got paid.

Q.   Okay.  And DEA 103, was it signed?

A.   It had to be signed.  I wasn't present when they signed it, but he had to sign a 103.

Q.   I thought you said that you were present when he was paid; is that right?

A.    No.  I was -- when he got -- when that meeting happened, I wasn't present when he signed the paperwork. No, I was not present.  But when that meeting happened, I was present in Medellin, and I know he got paid.

Q.    How do you know he got paid if you weren't there?

A.    No.  I was in Medellin.  Not when he got -- directly when he got paid by the agents.  But the agents coordinated the meeting.  And at the time I believe his handler Jason Gifford.  And Jason Gifford was the one that told me, Hey, you're going to be in Medellin.  Check to see if these guys are going to get paid.  I called the Bogota office.  They said they had a meeting with him, and the Bogota office confirmed that they paid him.  And I was in Medellin at the time.

Q.    Okay.  So you did not see him getting paid, but you were told by another agent that he was paid?

A.    That's correct.

Q.    But you didn't see him get paid?

A.    No.

Q.    Okay.  And you don't know when this was?

A.    2016, '17.  Around there.

Q.    Okay.  And you testified that he was deactivated in January of 2018; is that right?

A.    I don't remember the exact date he got deactivated, but I know he got deactivated.

Q.    Right.

A.    I didn't handle him, so I don't know the details on when he got deactivated.  But I know he got deactivated around 2017, 2018.

Q.    Uh-huh.  But you testified just now that it was January of 2018; is that right?

A.    No.  I testified he got deactivated.  I didn't give a date.

Q.    When Mr. -- when attorney Bailey asked you, you didn't say January of 2018?

A.    Me?  Did I say that?  No.

Q.    Okay.  To your recollection, when was he deactivated?

A.    2017 or 2018.

Q.    Okay.  How do you know this?

A.    I was told again.

Q.    By whom?

A.    Could have been DeJoy, Brian DeJoy.

Q.    Okay.  That's the same DeJoy in attorney Bailey's Exhibit 4?

A.    That's correct.

Q.    And who is he?

A.    He's a retired DEA agent now.

Q.    Okay.  Who was he at the time?

A.    A DEA agent based out of Boston.

Q.    What was association with Mr. Zapata?

A.    He worked with Mr. Zapata on multiple cases.

Q.    Okay.  So all of this is secondhand, though?

A.    That's correct.

Q.    Okay.  Now, can someone be an independent contractor with multiple offices at DEA at the same time?

A.    That's correct.

Q.    So when you talk about Mr. DeJoy telling you that Mr. Zapata was deactivated, would he have been talking about his own office or would he have been talking about all of DEA deactivation?

A.    I don't know.

Q.    You don't know?

A.    No.

Q.    So when you said he was deactivated, you couldn't put a date on it, but what were you referring to: a single office or all of DEA?

A.    We were told in general.

Q.    Who is "we"?

A.    Our group was told that he was deactivated, in general.  So it could have been meaning no other office -- no other group can work with him.

Q.    Okay.  Your group was Group 13 at the time?

A.    Thirteen at the time.

Q.    Okay.  And did Mr. DeJoy tell you personally?  Or

when you said "we" were told --

A.   Yeah.

Q.   -- the group was told?

A.   Mr. DeJoy told me personally.

Q.   Okay.  So was the rest of the group told as well not to use him, you said?

A.   I can tell you -- I can talk about me.

Q.   Right.  So was there any other communication besides Mr. DeJoy telling you personally?

A.   What do you mean other communication?  Mr. DeJoy told me.  Then I confirmed it with Jason Gifford.  I talked to John Oldano at the time.  They confirmed that he was deactivated.

Q.   And were any of these people your supervisors?

A.   No.  None.

Q.   And you don't recall when this was, just one last time?

A.   No.

          MR. PALAZZO:  No further questions, Your Honor.

          THE COURT:  Thank you.  Mr. Bailey, any redirect?

          MR. BAILEY:  Yes, Your Honor.

          ***********************

**REDIRECT EXAMINATION**

**BY MR. BAILEY:**

Q.    With regards to the January 2018, that was in Agent Oldano's statement, wasn't it?

A.    That's correct.

Q.    And that's where you -- because I asked you the question, didn't John Oldano say it was January 2018.

And with regards to the meeting in Bogota, was that after he had left the United States and went back to Colombia?

A.    Yeah.  I just don't remember exactly.

Q.    When it was?

A.    I'm pretty sure he had already left, but ...

Q.    So if he left in December of 2018, you would have been in Medellin after you retired?

A.    Correct.

Q.    Okay.  Now, with regards to Agent Jose Irazary, are you aware that Jose Irazary was forging signatures on these 103s?

MR. PALAZZO:  Your Honor, is this a new line of questioning?  I object.

THE COURT:  You're objecting -- I'll sustain. I don't didn't hear anything about that on the cross-examine.

MR. BAILEY:  He was asked about 103s,

Your Honor.

THE COURT:  But this is -- you're not asking about 103s, in general.  I think was it general processes.  You're asking a specific question, so I'm sustaining the objection about an individual.  I am sustaining the objection, sir.  You can move along.

Q.   (BY MR. BAILEY) Are you aware that there was agents that were -- tried to write letters for Mr. Zapata and were refused by DEA because they're still active agents?

MR. PALAZZO:  Your Honor, objection.  This is a new line of questioning.  This is supposed to be redirect.

THE COURT:  I'll sustain that objection as well.

Q.   (BY MR. BAILEY) Okay.  Is there anything that -- the three agents that had submitted affidavits, they all worked with Mr. Zapata?

A.   Yes.

Q.   Okay.  And when you were doing your investigations, did you -- you talked to agents and active agents and retired agents in order to come to a picture about what happened?

A.   Yes, sir.

Q.   And he talked about the Lexis and stuff like that. There's multiple open-source intel items that you can

look at, isn't there?

A.    That's correct.

Q.    And it's not all NCIC, TCIC, that kind of thing?

A.    That's correct.

          MR. BAILEY:  Okay.  That's all I have.

          THE COURT:  Okay.  Thank you.  Any recross, Mr. Pallazo?

          MR. PALAZZO:  No, Your Honor.

          THE COURT:  Thank you.  And the witness is excused.

          Thank you.  And just for scheduling purposes, Mr. Bailey, do you have additional witnesses?

          MR. BAILEY:  I've got one more witness, Your Honor.

          THE COURT:  Okay.  Why don't we take a five-minute break.  As far as I can see my clock, it's almost 11:05.  Let's start again at 11:10.

          We'll recess.

     (Recess from 11:04 to 11:10 a.m.)

          THE COURT:  Thank you.  Please be seated. Mr. Bailey, when you're ready, you can proceed to call your next witness, sir.

          MR. BAILEY:  Mateo Gomez, Your Honor.

     (Witness sworn)

          THE COURT:  Mr. Gomez, please state and spell

your name for the record.

THE WITNESS:  Good morning.  My name is
Mateo Gomez, M-a-t-e-o G-o-m-e-z.

THE COURT:  Thank you, sir.

**MATEO GOMEZ,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. BAILEY:**

Q.   Mr. Gomez, where do you live?

A.   I currently live in Plantation, Florida.

Q.   And who do you live with?

A.   My wife -- my girlfriend and my one-month-old
daughter.

Q.   Okay.  And how is Mr. Zapata related to you?

A.   He's my uncle.

Q.   Okay.  How old are you?

A.   I'm 30.

Q.   Have you known him all your life?

A.   My whole life.

Q.   Okay.  Who else, family members, live in Florida of
Mr. Zapata?

A.   Currently my father.  Family members would just be
my mother.

Q.   Your father, your mother.  Your father is his
brother-in-law?

A.   Brother-in-law.  And his other nephew, my brother, who is also present, and my sister.

Q.   What's your brother's name?

A.   Alejandro Gomez.

Q.   Okay.  You've heard the government say that he owned a lot of houses and had bank accounts.  Are you aware of any of the these?

A.   Not that I'm aware of.  No, sir.

Q.   Are you aware that he got scammed out of his money once he got back to Colombia?

A.   I'm not too knowledgeable, but I did overhear something about that.  Yes, sir.

Q.   Okay.  Is there any property that your family knows of that he still owns?

A.   No, sir.

Q.   Okay.  Now, when he left here in December of 2018, was that because he had been deactivated, or do you know?

A.   Not that I know of, sir.  I'm not aware why he left.

Q.   Did he tell -- okay.  I'm sorry.  Did he talk about his employment with the DEA?

A.   Not to me, sir.  No.

Q.   Okay.  He kept it private, didn't he?

A.   Completely private.  I have no recollection of him ever speaking about it with me.

Q.   Okay.  And in 2015 did he get divorced?

A.    Correct.

Q.    Was it a contentious divorce?

A.    Contentious in what sense?

Q.    Were they fighting with each other?

A.    Yeah.  Yes.  I guess you could say that.

Q.    Did the ex-wife get most of the property?

A.    Correct.

Q.    Okay.  Did that include most of the houses and the money?

A.    Correct.

Q.    What was left he took to Colombia with him?

A.    Again, I have no recollection of what he took with him.  But, as far as I know, she pretty much took everything.

Q.    Okay.  Is -- is he a flight risk?

A.    Not at all, sir.

Q.    Has he always done what he said he would do?

A.    Always.

Q.    Is his word his bond?

A.    Word is bond.

Q.    Okay.  Did he have a regular job?

A.    He did have a regular job.  When I was very young, I remember he worked at BrandsMart.

Q.    What was that?

A.    BrandsMart is an appliance -- general appliance

store.  If I remember correctly, he was probably one of top employees there.

Q.    Okay.  And the -- was there any problems with Mr. Zapata that you're aware of?

A.    No problems, sir.

Q.    When he left in 2018, was that because it's cheaper to live in Colombia?

A.    Probably, yeah.

Q.    Okay.  You just don't know?

A.    I don't know, honestly.

Q.    Okay.  But he had just gone through a divorce, he got deactivated, and he left the United States?

A.    Correct.

Q.    And he's been in Colombia, in Medellin, ever since?

A.    Yes, sir.

Q.    Okay.  Has he ever moved, trying to avoid anybody?

A.    Not that I know of, sir.  No.

Q.    Okay.  Can you guarantee this Court that you'll do everything you can to make sure Zapata shows up for court?

A.    Yes, sir.  I can say on my behalf I can do pretty much anything that he would need for me to make sure he faces this and, you know, everything in due time.

Q.    What do you do for a living?

A.    Currently a project manager for my family business.

So we install commercial and residential fences, and I'm also a local barber.

Q.  And you're also going to ...

A.  I'm also in the fire academy right now.  Yes, sir.

Q.  To be fireman?

A.  Yes, sir.

Q.  And when do you graduate from that?

A.  I graduate December of this year.

Q.  Okay.  If Mr. Zapata comes lives with you, do you-all have room for him?

A.  Yes, sir.  More than enough room.

Q.  Okay.  And if -- if the Court imposes conditions such as electronic monitoring, do you-all have a phone that can be used to monitor that if they need it, or a Wi-Fi system?

A.  Yes, sir.

Q.  Okay.  And if he -- if he doesn't do what the Court tells him to, will you notify the Court?

A.  100 percent.

Q.  Because it would be -- I mean, you're trying to be a fireman?

A.  Yes, sir.

Q.  You're not going to mess that up, are you?

A.  Integrity before everything.

Q.  Okay.  Is that the way he -- he acts, too?

A.    That was the way he raised me.

          MR. BAILEY:  Okay.  Pass the witness.

          THE COURT:  Thank you.  Any questions for this witness, Mr. Pallazo?

          MR. PALAZZO:  Yes.

**CROSS-EXAMINATION**

**BY MR. PALAZZO:**

Q.    Good morning, sir.

A.    Good morning, sir.  How are you doing?

Q.    I'm well.  The home that you live in, who owns that home?

A.    I currently rent.

Q.    Do you know who the landlord is?

A.    The landlord, no.  It's a just, like, a property management company.

Q.    Okay.  Do you have permission to allow Mr. Zapata to live in your home with you?

A.    Yes, sir.

Q.    Do you have a lease?

A.    I do have a lease.

Q.    Does the lease prohibit people who are not listed currently on the lease to live on the property?

A.    No, sir.

Q.    There's no clause like that?

A.    No clause.

MR. PALAZZO:  No further questions.  Thank you.

THE COURT:  Thank you.

Anything further, Mr. Bailey?

MR. BAILEY:  I don't have any further questions, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Gomez, you're excused.

THE WITNESS:  Thank you.

THE COURT:  And no further evidence from the defense, correct, Mr. Bailey.

MR. BAILEY:  Your Honor, I'd like to proffer testimony for four witnesses.

THE COURT:  You may proceed.

MR. BAILEY:  First of all, Jason Gifford is a retired DEA agent.  He would testify that he is the one that originally brought Mr. Zapata on as an informant, after his brother-in-law -- not Mr. Zapata, but his brother-in-law, got in trouble.  And Mr. Zapata worked off the debt of his brother-in-law.

He's never been in any trouble.  He's always done what he was told, and they were told back in the '90s that they didn't have to pay taxes, because they -- it's the same thing as what Joe -- John Oldano said, who was the later agent assigned to Mr. Zapata.

Okay.  The second thing is Chris White.  Chris

White is an agent that was terminated. He's now in Cleveland as a deputy. He's got his dismissal being appealed to the Merit Selection Board.

Chris White would testify that Jose Irazary forged 103s with other people's names, including Chris White's name, to try to turn them in to get money, to say he'd given informants money. And so -- he's a potential witness for trial.

The next one is Chris Murphy. Chris Murphy is an active agent who is in Australia. He will testify similar to the other three agents, that he knows Mr. Zap and would -- would like to be here to testify for him, but the DEA prevented him from coming here because attorneys told him he couldn't come.

The last one would be Mr. Zapata. Mr. Zapata is a dedicated employee of the U.S. Government for more than 20 years. He's never done anything wrong. He had two DUIs which are noted on the deal. He did the probation, and he's -- he's never been an escape risk. He's never tried to run.

There is no money. And certainly I wouldn't be here, having taken $14,000 on this case and worked on it for the last year, if he had more money. But I'm doing it pro bono. The allegations of the government, according to Mr. Zapata, are untrue. He doesn't know how

much money he got.  Money he would get, he would never receive a receipt.  He was told he didn't have to pay taxes, and he did what he was told.

He paid taxes on money that he received 1099s and W-2s on, as noted in the affidavit of the agent -- the IRS agent.  But he didn't pay taxes on stuff that he was told not to pay taxes on.  And he didn't know how much it was, because a lot of times that money was given to him to pay different people who also worked on the same case.

So when you have four or five informants working on one case, there was a sum of money that went out, he might be the one that signed it or it might have been Jose Irazary forging it.  We don't know because we haven't seen them.  But he didn't -- he doesn't know.

And so -- and there was never any IRS demand. There was never any request for him to pay taxes.  All there was, was on June 17th, they came and picked him up. He was willing to talk to them, but he wanted his lawyer there and they wouldn't allow that.

That's all I have, Your Honor.

THE COURT:  Thank you, Mr. Bailey.  So I assume there's no further evidence from the government, Mr. Pallazo?

MR. PALAZZO:  That's correct, Your Honor.

THE COURT:  Okay.  So we can proceed to the argument phase of the hearing.  And, again, for both counsel, you're welcome to stay at your tabletop lecterns or come to the center podium.  Either way is fine.

MR. PALAZZO:  Your Honor, I urge the Court to consider three factors that are found in Title 18, Section [3412](g) *[sic]*, of the United States Code, and all three weigh heavily in favor of detention.

First, the nature and circumstances of the charged offenses, which are filing a false tax return and failure to file an income tax return, these are felony offenses, Your Honor.  They call for up to five years imprisonment upon conviction.  That is certainly incentive enough for the defendant to flee, if released.

The second factor for the Court to consider is the weight of the evidence.  The case is strong, Your Honor.  It's clear and convincing what will be a very straightforward trial presentation by the government, filled with live witnesses of people that paid the defendant and then witnessed him signing the acknowledgment of tax warnings, an example of which was proffered here today, and that I proffer there will be dozens more of at the trial.  So there will be verbal warnings and written warnings that will be part of the trial, and there will be multiple witnesses testifying to

it.

This is also a somewhat sophisticated defendant who had real estate holdings. You heard lots of complex work for the DEA. This is simply not an oversight defense that the government will be overcoming. This is a straightforward, strong case, and the weight of the evidence certainly -- certainly favors the defendant's detention.

The third factor for the Court's consideration are the history and characteristics of the defendant. They all point towards flight, Your Honor, from this district, and likely from this country. There is proffered evidence about unreported millions of dollars, deep family connections in a foreign country which happens to be Colombia, criminal connections in Colombia. You even heard it from the proffered witness testimony, Mr. David. Mr. David testified he certainly knows narcos. Not to mention using his familiarity with law enforcement, being an independent contractor for 20 years. All of these characteristics, knowledge, know-how will aid him in escaping justice.

And so for all of those reasons, Your Honor, as well as those found in the government's brief, there is a preponderance that the defendant is a flight risk, and there is no condition or combination of conditions that

will reasonable assure the defendant's appearance at trial.  And the government urges the Court to continue to detain the defendant without bond.

Thank you.

THE COURT:  Thank you, Mr. Pallazo.

Mr. Bailey, you may proceed.

MR. BAILEY:  Your Honor, the government says this is a strong case with a strong punishment.  If Mr. Zapata escapes or he doesn't show up, he's not looking at five years, he's looking at ten years.  He's already done a year in a -- in a Colombian prison that he gets credit for towards his sentence.  As you well know, because of the First Step Act, generally, the inmates can expire their sentence within 66 percent of their sentence now.  So he would have about two years left if he just sat in jail on the maximum sentence of five years.  So it's not a serious case.  The serious cases are ten to life.  This is a very minor case, as the Colombia government found in dismissing Count 4.

There is no evidence.  There's -- there was an opening statement that was submitted as a proffer, that would probably be better at trial, alleging what Mr. Palazzo believes happened.  I've presented two witnesses that show that what he believes happened didn't happen.

First of all, Mr. Zapata left in 2018 -- December of 2018 after he had been deactivated and after he had sold all of his properties three years earlier and split it with his wife.  So there's no six houses.  There's no money in Colombia.  If there are, the government can certainly show that and charge him with perjury, because he signed the statements saying I don't have any money.

And so the government is -- as I said, and it may be harsh, but this is just an issue of where a U.S. Attorney is trying to push a guy around and won't let him talk without his -- and wants him to talk without his lawyer there.  And that's not going to happen with me.

But he should be released.  You can set whatever conditions you want.  I would suggest, because -- in a very traumatic prison, that he get alcohol treatment.  Because there is -- if he is released, he has had two DWIs more than 20 years ago, and I would not want that to happen again.

Thank you, Your Honor.

THE COURT:  Thank you, Mr. Bailey.

Anything further, Mr. Pallazo?  A response?

MR. PALAZZO:  No.  Not on detention, Your Honor.

THE COURT:  Okay.  Thank you.  So I thank

counsel for their arguments today and their presentation of evidence, and thank the witnesses who testified.

So I've considered all of the evidence on the factors that Mr. Pallazo delineated.  Mr. Bailey, was there something further?

MR. BAILEY:  Your Honor, I'm sorry.  I forgot. You never asked about the pretrial bail report.  There was a mistake on it.  It said -- in the three recommendations, it said that he's got a Colombian and U.S. passport.  I offered to give those to the probation officer on Friday because I had them in my hand.  They're in my office.  So he doesn't have any passport.  The only passport he has is in that agent's hand right there. He's got it.  So he doesn't have a passport.

And the second thing is, on the second issue that she said was, because he's done international travel, well, if we thought that every person that did international travel on the -- in support of the U.S. Government was a flight risk, there would be a lot of military members, there would be a lot of retired agents, who would be a flight risk.  And that's just simply not true.

These are upstanding citizens.  This guy has never violated the law except for two DWIs.  Most informants that we deal with violate a lot of laws,

including Gustavo, that is also known as "Tiny."

Thank you, Your Honor.

THE COURT:  So, Mr. Bailey, I'm about to make my ruling.  So if there's anything else you'd like to say, this is the time, sir.

(No audible response)

THE COURT:  Okay.  So I've considered all of the evidence presented today and the recommendation of Pretrial Services, which is detention in this case, and I will be issuing a written order of detention.

I find that the government has met its burden to show by a preponderance of the evidence that detention is required based on serious risk of flight, and that there is no condition or combination of conditions that I can set that will secure the attendance of Mr. Zapata as required.

And among the factors of the first three, the danger to community -- to the community or to others, as Mr. Pallazo said, is not relevant to my finding.  But particularly strong is factor 3, the history and characteristics of the defendant, and, in particular, his ties to a foreign country.

So, for that reason, I'm going to order detention.  And I'll be issuing that order shortly.

Is there anything further the government would

like the Court to take up at this time?

MR. PALAZZO:  Yes, Your Honor.  Just for the record, I just want to note that, prior to the hearing, I gave -- the government has begun discovery, and I have given attorney Bailey a disc with about 1400 pages of discovery on it.  I just wanted to note that.

I also want to apologize for being late.  I received an ECF notice to go to Judge Howell's courtroom.  This is my first time in the courthouse other than charging the case, and I apologize for the mix-up.

THE COURT:  I appreciate the apology, Mr. Pallazo.  I let it go, knowing that you're not here.  On the civil side, we typically have attorneys who have never been here before.  On the criminal side, it's rare to have folks who haven't been in the division.  The order was issued by Judge Howell, but it said to come here on the sixth floor in my courtroom.  So I assume when you are back that you'll read more carefully and see you'll be on the fourth floor before Judge Ezra in his courtroom.

MR. PALAZZO:  Yes, Your Honor.  Thank you.

THE COURT:  Mr. Bailey, was there something further from the defense?

MR. BAILEY:  Your Honor, different districts do it different ways.  Do you issue a report and

recommendations, because I've got to appeal to the District Court on this.  Do you issue a report and recommendation or an order, because not all the ECF entries are -- allow you to appeal directly to the District Court.

THE COURT:  I'll be issuing a written order today.

MR. BAILEY:  Okay.  Thank you.

THE COURT:  Thank you.  Our proceeding is adjourned.

(Proceedings concluded at 11:30 a.m.)

**REPORTER'S CERTIFICATE**

I, Arlinda Rodriguez, do hereby certify that the foregoing was transcribed from an electronic recording made at the time of the aforesaid proceedings and is a correct transcript, to the best of my ability, made from the proceedings in the above-entitled matter, and that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

/S/ Arlinda Rodriguez                    July 21, 2025

ARLINDA RODRIGUEZ                        DATE

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)